Filed 7/31/14  Pekin v. Valverde CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GULDIN PEKIN,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GEORGE VALVERDE,<br><br>Defendant and Appellant. | B247358<br><br>(Los Angeles County<br>Super. Ct. No. BS136504) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Reversed.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Assistant Attorney General, Michael E. Whitaker and Leah C. Gershon, Deputy Attorneys General, for Defendant and Appellant.

Michael L. Schultz for Plaintiff and Respondent.

INTRODUCTION

The Department of Motor Vehicles (the DMV) appeals from the judgment of the trial court granting the petition of Guldin Pekin for writ of mandate (Code Civ. Proc., § 1094.5) and directing the DMV to revoke its suspension of her driving privilege for one year based on her failure to complete a chemical test. The issue is whether the evidence supports the trial court's finding the arresting peace officer abused his discretion in determining Pekin "fail[ed] to complete, a chemical test" pursuant to Vehicle Code section 13353.[1] We reverse.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The arrest and testing*

We examine the record according to the usual rules of appellate review. (*Lake v. Reed* (1997) 16 Cal.4th 448, 456-457.) On July 9, 2011, California Highway Patrol Officers Sapp and Olsen stopped Pekin on suspicion of driving under the influence of alcohol after she weaved out of her lane on the Hollywood Freeway and forced another car to take evasive action to avoid a collision. Officer Sapp concluded Pekin was intoxicated based on a "strong" smell of alcohol emitting from the vehicle and on observing Pekin's bloodshot and watery eyes, and slurred and soft speech. Pekin admitted having consumed a beer. After giving Pekin the standard admonishment, Officer Sapp administered a preliminary alcohol screening devise (PAS) test. Although Officer Sapp instructed Pekin "3-4 times" that she must blow continuously to complete the test, she never complied. Instead, Pekin "would put her lips on the tip of the mouth piece and would give a quick puff of air then start sucking in air and then would stop." The officer's written statement indicates that Pekin "failed to perform [the] field sobriety tests as explained." Three manual PAS samples from Pekin showed results of .105 percent, .080 percent, and .101 percent.

---

[1]      All further statutory references are to the Vehicle Code, unless otherwise indicated.

2

Officer Sapp arrested Pekin for driving under the influence of alcohol and transported her to the 77th Street Jail for chemical testing. At first Pekin "was not willing to complete a chemical test." Officer Sapp advised her of the implied consent law and that her driving privileges would be suspended or revoked if she refused or failed to complete a required chemical test. Pekin opted for the breath test. The officer told Pekin that if she were not able to complete the test, it would be marked as a "refusal," and she would have to complete a blood test. Officer Sapp testified Pekin "was advised of implied consent. Okay? At that time she didn't want to do anything. Okay? I read her the back of the DS 367 advising her that she was going to lose her license. [¶] . . . [¶] At that time she says, okay, I'll do a breath test."

Officer Sapp informs drivers that they must blow into the chemical machine "anywhere from four to seven seconds" to complete the test. The so-called EC/IR usage log for the breath test machine indicates, and Pekin testified, that she blew into the breath machine three times. The first time, Pekin blew 130 cc of air over .37 seconds. The second time, she blew 853 cc for 1.52 seconds. There are no data for the third blow. The log indicates as the "End of Test Status: Test refused." Pekin testified that when she tried to blow, the officer stated, "okay, okay, it's not working out." She "begg[ed] to" try "again . . . So I did – I did three blows in a pretty short time." He testified, "she put her mouth on the mouthpiece. She would give a quick little, and then would either stop blowing [or] suck in air, which causes the machine to stop, ultimately unable to provide two sufficient samples." In between tries, he would instruct her about her breaths. Officer Sapp testified "[s]he didn't complete the breath test." Pekin "would not blow into the machine."

Officer Sapp spoke to his sergeant who told Sapp to indicate Pekin's results as "refusal" "because [Pekin] was unable to complete the chemical test." Officer Sapp instructed Pekin "multiple times" that she would need to complete a blood test or he would mark her as a "refusal." According to the arrest report, after being asked multiple times, Pekin responded, " '*I won't do blood, I don't like needles.*' " (Italics added.)

3

Finally, Officer Sapp wrote that Pekin "refused all chemical tests" and recommended that the City Attorney file charges against Pekin for driving under the influence of alcohol.

Pekin's expert, forensic toxicologist Darrell Oliver Clardy, explained that the breath machine either prints out a mouth-alcohol level or indicates insufficient breath. To record a refusal to blow, the officer running the machine must press a button, which shuts down the instrument. Clardy testified that "[t]he instrument *would* have taken another test, and she [Pekin] *would* have kept blowing. Because she went from 130 to 853 [ccs in volume of air]. *The third test very reasonably would have been a good test* [*of another driver*], *as the test just above* [*on the EC/IR log*] *indicates*." (Italics added.) Asked why the machine indicated three tests were done but only two revealed data, Clardy opined "I'm not sure what's exactly going on. We have – something's going on." The log "*gives an indication of an electronic malfunction on the instrument at the time*." (Italics added.) He explained that "often the software is written [so that] if the officer pushes the button . . . to stop the test, then it would just say test refused." Clardy surmised, if Officer Sapp had not pressed the "refused" button, the machine would have logged an *insufficient* sample. Clardy opined that the officer denied Pekin the opportunity to blow more than twice. Pekin also submitted letters from her dentist and her Botox doctor who stated that Pekin has a fear of needles.

2. *Administrative hearing and Pekin's writ petition*

The administrative hearing officer found that Pekin was given a choice of chemical tests and chose a breath test but was unable to complete it. Officer Sapp then offered Pekin the blood test but Pekin explained she did not like needles, which response the Officer Sapp deemed a "refusal" to submit to the blood test. The hearing officer was unpersuaded by Pekin's claim that she suffered from a needle phobia justifying her refusal to submit to the blood test. The DMV imposed a one-year suspension of Pekin's driving privileges. Pekin's petition for writ of mandate ensued.

3. *The trial court's ruling*

The trial court found Pekin did not demonstrate she was incapable of submitting to a blood test and she never communicated to the officer that a needle phobia rendered her

4

incapable of taking a blood test. (§ 23612, subd. (a)(2)(A).) Pekin told the officer only that she "did not like" needles and "could not handle them." Pekin called no medical expert to explain that she was psychologically unable to summit to a blood test. As Pekin undergoes Botox treatments, which utilize needles, the court found Pekin was merely afraid of needles. Thus, Pekin failed to establish that a blood test was unavailable, with the result, the court found, Pekin "refused to submit to a blood test."

However, the court found Pekin did not refuse to undergo a breath test, and *did not fail to complete that test*. The court concluded instead that Officer Sapp did not expect Pekin to complete the breath test. The officer appeared to the court to be in a hurry to finish the breath test and move on to the blood test. The court agreed with Pekin's expert Clardy and ruled that Officer Sapp abused his discretion by cutting off Pekin's attempts to take the breath test given the increasing volume of Pekin's second attempt and the higher number of attempts other arrestees recorded. The court found Officer Sapp acted hastily in terminating the breath test. Finding no evidence that Pekin was deliberately trying to evade the test, the court ruled, Pekin thus did not fail to complete the test; rather Officer Sapp did not permit her to perform it. The trial court granted the petition for writ of mandate and ordered the DMV to set aside its suspension of Pekin's driving privileges. The DMV filed its timely appeal.

## CONTENTS

The DMV contends there is no substantial evidence to support the trial court's finding Officer Sapp abused his discretion in terminating the breath test after concluding Pekin failed to complete it.

## DISCUSSION

1. *Standard of review*

For the purpose of determining the appropriate standard of judicial review of an administrative decision to suspend or revoke a driver's license, the license is a "fundamental right." (*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 398.) Under Code of Civil Procedure section 1094.5, the trial court examines the administrative record for errors of law and exercises its independent judgment to

5

determine whether the weight of the evidence supported the administrative decision. (*Lake v. Reed*, *supra*, 16 Cal.4th at pp. 456-457.) " 'In making that determination, the trial court had to "weigh the evidence and make its own determination as to whether the administrative findings [should be] sustained." [Citation.]' [Citation.] 'In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' [Citation.]" (*Garcia v. Department of Motor Vehicles* (2010) 185 Cal.App.4th 73, 82.) On appeal, we determine whether the trial court's findings are supported by substantial evidence. (*Ibid.*)

2. *The implied consent law*

As part of its effort to combat the problem of drunk driving,[2] the Legislature enacted section 23612, the implied consent law. (*Smith v. Department of Motor Vehicles* (1986) 179 Cal.App.3d 368, 373 (*Smith*).) The implied consent law provides that "a person lawfully arrested for driving a motor vehicle while under the influence of alcohol impliedly consents to submit to a chemical test, by breath or blood, to determine his or her blood-alcohol level while driving the vehicle." (*White v. Department of Motor Vehicles* (2011) 196 Cal.App.4th 794, 798 (*White*).) "If the person arrested either is incapable, or states that he or she is incapable, of completing the chosen test, the person shall submit to the remaining test." (§ 23612, subd. (a)(2)(A).) " 'The implied consent law is intended "to obtain the best evidence of blood alcohol content at the time of the arrest" [citation] by means of securing "the civil cooperation of all persons privileged to drive" . . . .' [Citation.]" (*Smith*, *supra*, at pp. 373 -374, italics omitted.)

The DMV is required to suspend or revoke a person's driving privilege if the person "refuses the officer's request to submit to, *or fails to complete*, a chemical test or tests pursuant to Section 23612" and the officer had reasonable cause to believe the

---

[2] In California it is unlawful for a person to drive under the influence of any alcoholic beverage or to drive with 0.08 percent or more of alcohol by weight in his or her blood. (§ 23152, subds. (a) & (b).)

person had been driving a motor vehicle in violation of sections 23152 or 23153. (§ 13353, subd. (a), italics added.)[3]

The DMV challenges the trial court's determination that the weight of the evidence showed Pekin *did not fail to complete the chemical breath test* but that Officer Sapp prematurely terminated it. (§ 13557, subd. (b)(1)(C).) The DMV does not find fault with the court's finding Pekin failed to submit to a blood test. Rather, the DMV contends there is no evidence to support the finding that Officer Sapp abused his discretion in deciding that the chemical breath test would not work. The DMV asserts that the weight of evidence shows Pekin engaged in a course of conduct that exhibited gamesmanship, which conduct justified Officer Sapp's determination, in his discretion, that the breath test was not going to provide a useful result. We agree.

Law enforcement officers have discretion to decide the feasibility of a chemical test under section 13353 by exercising prudent judgment and common sense. (*Smith*, *supra*, 179 Cal.App.3d at pp. 374-375.)

The trial court's finding that Officer Sapp abused his discretion was based on Clardy's testimony about his conclusion that Officer Sapp acted hastily by terminating the test and that had the officer allowed Pekin more tries, she would have blown a sufficient amount of air. The court was influenced by Clardy's explanation about the increased volume in Pekin's second attempt and the higher number of other arrestees' recorded attempts. However, expert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence, or on matters not reasonably relied upon by other experts, or on speculative or conjectural factors. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; *People*

---

[3]     Section 13353, subdivision (a) reads, "If a person refuses the officer's request to submit to, or fails to complete, a chemical test or tests pursuant to Section 23612, upon receipt of the officer's sworn statement that the officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23140, 23152, or 23153, and that the person had refused to submit to, or did not complete, the test or tests after being requested by the officer, the department shall do one of the following: [¶] (1) Suspend the person's privilege to operate a motor vehicle for a period of one year. . . ."

7

*ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567-1568.)

Clardy's testimony that Pekin's next attempt "very reasonably would have been a good test" is utterly speculative and is unsupported by the evidence that showed Pekin failed to blow for a sustained period, three times in the field and three times at the 77th Street Jail. It does not necessarily follow from the increasing length of Pekin's second effort at the police station that her next attempt would have been *sufficient*. As support for this conclusion, Clardy pointed to the test given to the driver prior to Pekin, which test is certainly not evidence of what Pekin would do. Clardy then contradicted his own testimony that the machine would have taken another sufficient sample by surmising that the reason Pekin's last attempt did not register on the log was a malfunction with the machine. "It is axiomatic that taking a breath test requires a machine that is operative. . . . It would have been futile to continue to take further samples on that machine as it was not functioning properly." (*Gobin v. Alexis* (1984) 153 Cal.App.3d 641, 649.) Clardy's opinion that Officer Sapp abused his discretion by denying Pekin the opportunity to blow more than twice conflicts with Pekin's testimony and the log's indication, that Pekin blew three times. Absent Clardy's speculative, unsupported, and contradictory testimony, there is simply no evidence to justify the trial court's conclusion that the weight of the evidence showed that Officer Sapp abused his discretion by concluding the test was not working.

Without Clardy's testimony, there is no evidence to support the trial court's determination that the weight of the evidence contradicted the findings of the administrative hearing officer. *Garcia v. Department of Motor Vehicles*, *supra*, 185 Cal.App.4th 73, is instructive. There, the driver engaged in stalling tactics to reduce his blood alcohol content by staring at the machine and changing his mind about which test to take. (*Id*. at p. 78.) The officer advised the driver that he needed to comply with testing or his conduct would be considered a refusal and he would lose his license for a year. (*Ibid.*) The officer told the driver to place his lips on the mouthpiece of the breath machine and blow strongly and steadily until the machine beeped. The driver claimed not to comprehend the directions. The officer instructed the driver three more times, after

8

which the driver put his lips on the mouthpiece and blew for about one and a half seconds before stopping. The driver was given one more time to comply, but simply stared at the mouthpiece. (*Ibid.*) The officer deemed the driver's lack of cooperation to be a refusal to take a chemical test. (*Ibid.*) The administrative hearing officer agreed. (*Id*. at p. 79.) The trial court upheld the ruling and the appellate court affirmed, stating the driver "failed to complete the breath test after being repeatedly warned that his failure to do so would constitute a refusal. The record shows that Garcia tried ineffectually to blow once and then refused or declined to try any further. The trial court did not find that Garcia was 'incapable, or state[d] that he . . . [was] incapable, of completing the chosen test . . . .' (§ 23612, subd. (a)(2)(A).) The trial court did not find credible Garcia's testimony that he was unable to complete the test because of nausea." (*Id.* at p. 83; accord, *White*, *supra*, 196 Cal.App.4th at pp. 797, 798 & 800 [where phlebotomist was repeatedly unsuccessful in drawing blood, driver requested that the technician stop and then refused the breath test. Held driver failed to complete a chemical test.].) These authorities convince us the circumstances here are susceptible of one conclusion namely that Officer Sapp exercised his discretion in concluding that Pekin was not going to provide workable results with the breath test.

The record shows the officer repeatedly instructed Pekin on how to use the breath test machine and each time she ineffectually blew into the mouthpiece. Pekin failed to properly blow at least six times, thrice at the scene of her arrest where she nonetheless recorded blood alcohol levels above the legal limit, and three times at the police station. She begged for, and he allowed her, a third attempt at the police station, although he did not remember that attempt by the time of the hearing. There is no evidence other than speculation that a fourth attempt would have produced a satisfactory volume of air, whereas Officer Sapp testified he had concluded she would not blow into the mouthpiece long enough to register a result. "Compliance with the provisions of the implied consent statute requires that the arrestee complete, not merely attempt, one of the . . . possible tests." (*Gobin v. Alexis*, *supra*, 153 Cal.App.3d at p. 649.) It was not Pekin's failure to produce a measurable *breath* sample that Officer Sapp labeled as a failure to complete a

9

chemical test; it was her refusal to then submit to the blood test -- about which there is no dispute -- that triggered the notice of suspension.  (See *Fitzpatrick v. Department of Motor Vehicles* (1993) 13 Cal.App.4th 1771, 1775 [failure to comply with implied consent law resulted not from failure to produce measurable breath sample but later refusal to submit to blood test].)  As a matter of law, the weight of the evidence does not support a finding contrary to that of the administrative hearing officer.

DISPOSITION

The judgment is reversed.  Appellant to recover costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.

10